AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )          Case No.    '22 MJ1025
Samsung Galaxy S10 Serial # RF8M32YZ59B, in )
evidence at FBI, 10385 Vista Sorrento Pkwy, San Diego, )
CA 92121 )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1752(a)(1) and (2) | Entering in any Restricted Building or Grounds Without Lawful Authority; |
| 40 U.S.C. § 5104(e)(2)(D) & (G | Violent Entry and Disorderly Conduct on Capitol Grounds |
| 18 U.S.C. § 1512(c)(2) | Obstruct Official Proceeding |

The application is based on these facts:

See Attached Affidavit of F.B.I. Special Agent Sean MacDougall, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Sean MacDougall, F.B.I.
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date:    03/17/2022

_____
*Judge's signature*

City and state:  San Diego, California

Karen S. Crawford, U.S. Magistrate Judge
*Printed name and title*

**Attachment A-1**

     Samsung Galaxy S10 Serial # RF8M32YZ59B ("**subject device 1**") seized on November 3, 2021 and currently located in evidence at the Federal Bureau of Investigation's San Diego Field Office, 10385 Vista Sorrento Pkwy, San Diego, CA 92121.

**Attachment B**

**Things to be Seized**

Items to be seized are limited to evidence of the offenses under investigation: (1) knowingly entering or remaining in any restricted building or grounds without lawful authority, in violation of **(1) 18 U.S.C. §§ 1752(a)(1) and (2), (2) 40 U.S.C. §§ 5104(e)(2)(D) and (G),  (3) 18 U.S.C. §§ 1512(c), (4) 18 U.S.C. § 111 (a)(1), (5) 18 U.S.C. § 2,** and **(6) 18 U.S.C. § 231** (collectively, the "TARGET OFFENSES") , as well as contraband, fruits of the federal crimes listed above, things otherwise criminally possessed, property designed or intended for use or which is or has been used as a means of committing the crimes listed above.  The items to be searched for and seized includes documents, cellular telephones, computers, and evidence in electronic form.  The time period for the records sought shall be limited to October 1, 2020 through October 26, 2021.

The items to be seized shall be limited to:

a. Evidence concerning planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

b. Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

c. Evidence concerning awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

d. Evidence concerning efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

e. Evidence related to a conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

f. Evidence concerning the breach and unlawful entry of the U.S. Capitol, and any conspiracy or plan to do so, on January 6, 2021;

g. Evidence of any conspiracy, planning, or preparation to commit those offenses, including travel to or from Washington, D.C.;

h. Evidence concerning effort after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

i. Evidence concerning materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or force;

j. Evidence of the state of mind of HUMPHREYS and/or other co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

k. Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters related to the criminal activity under investigation, including records that help reveal their whereabouts;

## AFFIDAVIT

I, Sean MacDougall, being duly sworn, hereby depose and state:

## I

## PURPOSE OF THIS AFFIDAVIT

1.    I make this affidavit in support of two search warrants to search:

(a)  Samsung Galaxy S10 Serial # RF8M32YZ59B (**subject device 1**) (described further in **Attachment A-1**); and

(b) Android cell phone, IMEI 356694097403224 (**subject device 2**) (described further in **Attachment A-2**)

(collectively, "**the subject devices**"). The purpose of the search warrants is to seize property that constitutes evidence, contraband, fruits of the specified crimes, or things otherwise criminally possessed, as well as property designed or intended for use or which is or has been used as a means of committing the following federal offenses that have been committed by Jonathan HUMPHREYS, also known as "the Subject," and other identified and unidentified persons, including others who may have been aided and abetted by, or conspiring with, the Subject, as well as others observed by the Subject: **(1) 18 U.S.C. § 1752(a)(1) and (2)**, which makes it a crime to (1) knowingly enter or remain in any restricted building[1] or grounds without lawful authority to do so; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; or attempts or conspires

---

[1]    For purposes of Section 1752 of Title 18, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service, including the Vice President, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

to do so; **(2) 40 U.S.C. § 5104(e)(2)(D) and (G)**, which makes it a crime to willfully and knowingly (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; and (G) parade, demonstrate, or picket in any of the Capitol Buildings; **(3) 18 U.S.C. § 1512(c)**, which makes it a crime to corruptly obstruct, influence, or impede any official proceeding, or attempt to do so, **(4) 18 U.S.C. § 111 (a)(1)**, which makes it a crime to forcibly assault, resist, oppose, impede, intimidate, or interfere with any person designated in title 18 U.S.C. § 1114 while engaged in or on account of the performance of official duties, **(5) 18 U.S.C. § 2**, which makes it a crime to aid, abet, counsel, or command an offense against the United States, and **(6) 18 U.S.C. § 231**, which makes it a crime to commit or attempt to commit any act to obstruct, impede, or interfere with a fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays or adversely affects commerce or the conduct or performance of any federally protected function, (as further described in **Attachment B**).

2.      On October 24, 2021, the Honorable Michael S. Berg issued federal warrants authorizing the search of HUMPHEYS' residence at 3440 Lebon Drive, Unit 4112, San Diego, CA 92122 (case number 21mj4307) and his 2005 Ford Ranger (21mj4069). The warrants specifically authorized agents to seize and search telephones. Agents executed the warrants on November 3, 2021, and seized the **subject devices**, among other evidence. The **subject devices** are currently in the custody of the F.B.I. at 10385 Vista Sorrento Pkwy, San Diego, CA 92121. The warrant issued by Judge Berg allowed 90 days (until February 1, 2022) for the seizure of evidence from the **subject devices**. Agents were not able to

complete the seizure of evidence by February 1, 2022. Accordingly, I request warrants authorizing search of the **subject devices**.

3.      The information contained in this affidavit is based on my own investigation, oral and written reports by special agents and support employees of the Federal Bureau of Investigation ("FBI") and other federal, state, and local law enforcement officers who collectively have several decades of experience in investigating domestic terrorism, tips from witnesses received at the FBI National Threat Operations Center ("NTOC"), physical surveillance, interviews, subpoenaed and public records, security camera footage, and database checks. Since this affidavit is being submitted for the limited purpose of securing authorization for the execution of the search warrants, I have not included each and every fact known to me concerning this investigation. Conversations below are set forth in substance and in part.  The dates, times, and amounts in this affidavit are approximate.

## II

## EXPERIENCE AND TRAINING

4.      I have been a Special Agent with the Federal Bureau of Investigation since December 2015. Prior to being designated as an FBI Agent, I was a military officer for ten years, the last three of which were spent conducting all-source counter-terrorism analysis for the Naval Criminal Investigative Service. After my time in the military, I attended New Agent Training at the FBI Academy in Quantico, a rigorous 20-week course training all aspects of FBI investigations. After being designated as a Special Agent, I was assigned to the Washington Field Office Joint Terrorism Task Force (JTTF) for three and a half years, and have been assigned to the San Diego JTTF since August 2019, where I specialize in the field of Domestic Terrorism. As part of my duties, I have maintained a high level of continuing education in the rhetoric, symbols, ideology, and tactics of various types of domestic extremists, as well as the laws governing hate crimes, weapons, explosives, and other violent crimes.

5.      Based upon my training, experience, and consultations with law enforcement officers experienced in criminal investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.  This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in riots in Government buildings may yield evidence:

    a.      tending to indicate efforts to learn about and communicate with others involved in illegally entering and remaining in the U.S. Capitol or other Government buildings, and/or participating in riots;

    b.      tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to learn about and communicate with others involved in illegally entering and remaining in the U.S. Capitol or other Government buildings, and/or participating in riots;

    c.      tending to identify co-conspirators, associates, or others involved in illegally entering and remaining in Government buildings or participating in riots;

    d.      tending to identify the user of, or persons with control over or access to, the cell phones;

    e.      regarding plans to travel to Government buildings[2]; and/or

---

[2] On May 5, 2021, an FBI colleague requested information from the Airline Reporting Corporation (ARC) regarding flight bookings made by HUMPHREYS during the time period around January 6, 2021. According to ARC, HUMPHREYS booked flights from San Diego to Baltimore on January 4, 2021, and from Baltimore to San Diego on January

f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

### III

### FACTS ESTABLISHING PROBABLE CAUSE
### Background – The U.S. Capitol on January 6, 2021

6.    The United States Capitol Police ("USCP"), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.    At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres. The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol. On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway. All of this area was barricaded and off limits to the public on January 6, 2021.

---

8, 2021. I know from my training and experience that most people book flight reservations online using computers, tablets, and cell phones, and that many people "screen shot" boarding passes and save them to their cell phones, or save digital boarding passes to a digital wallet in their cell phones. I therefore believe that evidence regarding HUMPHREYS' utilization of air travel to and from Washington, DC on the above dates is likely to be found in the **subject devices**.

8.     The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.     On January 6, 2021, a joint session of the United States Congress was scheduled to convene at the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The exterior plaza of the U.S. Capitol was closed to members of the public.

10.    A crowd began to assemble near the Capitol around 12:30 p.m. Eastern Standard Time (EST), and at about 12:50 p.m., known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

11.    The joint session began at approximately 1:00 p.m. in the House Chamber.

12.    At approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber. Also around this time, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building, in part because of a suspicious package found nearby. Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

13.    As the proceedings continued in both the House and the Senate, USCP attempted to keep the crowd away from the Capitol building and the proceedings underway inside. Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

14.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over additional barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by USCP officers or other authorized security officials. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

15.     At about 2:10 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.

16.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber. As rioters attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement officers were forced to draw their weapons to protect the victims sheltering inside.

17.     At approximately 2:30 p.m., known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building. Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured and several were

admitted to the hospital. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

18.     Also at approximately 2:30 p.m., as subjects reached the rear door of the House Chamber, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

19.     At around 2:45 p.m., subjects broke into the office of House Speaker Nancy Pelosi. At about the same time, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

20.     At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



21.    After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



22.    A subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter, stated "It's Only A Matter of Time Justice is Coming."

23.    During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





24.     At around 2:48 p.m., DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

25.     At about 3:25 p.m., law enforcement officers cleared the Senate floor.

26.     Between 3:25 and around 6:30 p.m., law enforcement was able to clear the U.S. Capitol of all of the subjects.

27.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

28.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

29.     Beginning around 9:00 p.m., the House resumed work on the Certification.

30.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. on January 7, 2021.

31.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

32.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate

with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

33.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

34.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:

[3]



---

[3] https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/

4



5



**Facts Specific to This Application**

35.     In an effort to identify individuals who unlawfully entered the U.S. Capitol Building, a search warrant for records in the possession of Google was issued in the United Stated District Court for the District of Columbia. The search warrant requested information for devices found within a specific restricted geographic area, namely within the U.S. Capitol Building, between 2:00PM and 6:30PM EST on January 6, 2021. Pursuant to this search warrant and further legal process, Google produced user account information for devices responsive to the warrant. This data provided the information that Google user accounts 1019630275131 and 809792087214 had a device or devices that were inside the U.S. Capitol building during this timeframe, and that the recovery telephone number for these accounts was 619-496-7355. The information provided by Google also contained a graphic representation of approximately where the device was located inside the U.S. Capitol, as well as what time the device entered and departed the geofenced area.

36.     FBI agents at the Washington Field Office served a 2703(d) court order to Verizon, the provider for this telephone number. Information obtained from this court order showed that the subscriber for this number was JONATHAN HUMPHREYS, with the email addresses jahoakland@gmail.com and jahoakland1@yahoo.com.

37.     Based on this information, an FBI colleague queried federal, state, and local databases, and identified JONATHAN HUMPHREYS, date of birth December 28, 1994, social security number 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 as a likely match. My colleague obtained HUMPHREYS' California driver's license photograph, which I then submitted to a unit at FBI headquarters. HUMPHREYS was identified on footage from two U.S. Capitol security cameras taken on January 6, 2021, three videos provided in tips to the FBI, and five images provided in tips to the FBI. After reviewing these tips and videos, I identified HUMPHREYS in the two security camera videos and three of the five still images provided by tipsters. The three videos provided by tipsters were all copies of the same video, and in

14

this video, I observed a person resembling HUMPHREYS, but whom I was unable to positively identify as HUMPHREYS.

38.   In these images, HUMPHREYS was dressed distinctively from others inside the U.S. Capitol building during the insurrection. HUMPHREYS wore a black business-style overcoat, a white dress shirt, a blue striped tie, black slacks, and black dress shoes.



Clockwise from top left: HUMPHREYS' CA driver's license photograph, a photo from a tip depicting HUMPHREYS in front of the Speaker of the House Office Suite, and a screen shot from tip depicting HUMPHREYS inside the Capitol Rotunda.

39.     Between May 21 and May 24, 2021, I reviewed U.S. Capitol security camera footage for areas and times on January 6, 2021, during which HUMPHREYS' device was located in the Capitol. I located several other videos in which I observed HUMPHREYS inside the U.S. Capitol Building. The proceeding paragraphs describe his movements inside the building. The times noted are derived from either the time stamp on the video, or, in the case of videos without time stamps, by adding the time in the video at which HUMPHREYS was observed to the start time of the video, which was preserved in the video file metadata. The locations in which HUMPHREYS was observed correspond to the locations of HUMPHREYS' device provided by Google. All times are in Eastern Standard Time.

a. At 2:23 PM, I observed HUMPHREYS entering the U.S. Capitol Building through a broken window next to the Senate Wing Doors on the ground floor of the building. This location in the building matched the graphical representation depicting where HUMPHREYS' Google-enabled device or devices entered the building. HUMPHREYS followed a crowd of people south through the hallway.



b. At 2:24 PM, I observed HUMPHREYS at the bottom of the Supreme Court Chamber Stairs. HUMPHREYS was holding a mobile phone in his hand and clipped what

16

I recognized to be a body worn camera (BWC) onto his jacket lapel. HUMPHREYS walked up the stairs out of the frame of the camera.



c. At 2:27 PM, I observed HUMPHREYS outside the Rotunda Bullfinch Door. HUMPHEYS was holding the BWC in his hand and pointed it directly at the camera before leaving the frame of the camera.



d. At 2:28 PM, I observed HUMPHEYS enter the Capitol Rotunda via the North Entrance. HUMPHREYS took a photograph or photographs with his cell phone, walked towards the South Entrance, then changed direction and walked towards the East Entrance, leaving the Rotunda at 2:28 PM.



e. At 2:29 PM, I observed HUMPHREYS entering the Rotunda Foyer. HUMPHREYS briefly spoke with a police officer, then re-entered the Rotunda through the East Door.



f. At 2:30PM, I observed HUMPHREYS re-entering the Rotunda through the East Door. HUMPHEYS walked directly to the South Door and Departed the Rotunda.

g. At 2:30 PM, I observed HUMPHREYS in Hallway H227. This hallway leads directly to the Speaker of the House Office Suite. HUMPHREYS appeared to be leading a large group of people towards the Speaker of the House Suite.





h. At 2:32 PM, I observed HUMPHREYS rounding a corner into Hallway H230, adjacent to the Speaker of the House Suite. I observed HUMPHREYS on another camera covering that hallway during the same minute, after which HUMPHREYS departed the frame. After HUMPHREYS turned right into Hallway H230, one of the people following HUMPHREYS in Hallways H227 kicked open the door into the Speaker's Suite and entered through the breached door. A large number of people, including three who were closely following HUMPHREYS, also entered the Speaker's Suite.





21



40.     Between October 1 and October 5, 2021, I again reviewed U.S. Capitol security camera footage for areas and times on January 6, 2021. I located additional videos in which I observed HUMPHREYS inside the U.S. Capitol Building.

a.     At 2:22 PM, I observed HUMPHREYS in a hallway near room S235, close to the Speaker of the House's office suite. HUMPHREYS walked to the end of the hallway with a small group of people, turned around, and walked back the way he came.



b.      At 2:43 PM, I observed HUMPHREYS in the Capitol Rotunda for the second time. HUMPHREYS entered the Rotunda via the north door and walked to the northwest side of the room. At 2:45 PM, HUMPHREYS lit a cigarette and began smoking. HUMPHREYS exited the Rotunda via the north door at 2:46 PM.






c.      At 3:02 PM, I observed HUMPHREYS inside the Rotunda again, in
the approximate center of a crowd. At 3:07 PM, HUMPHREYS walked from his



previous position to a line of police officers, who had begun pushing the crowd out of the
Rotunda. HUMPHREYS approached the line of officers, turned his back to them, and
pushed against the officers with his back. At 3:09 PM, HUMPHREYS broke off contact
from the police officers and walked towards the exit of the Rotunda, leaving at 3:10 PM
out of the west door.

d.      Based on this observation, I reviewed body worn camera (BWC)
footage from Washington, DC Metropolitan Police Department (MPD) officers present at
the US Capitol on that day. I identified two BWC videos that depicted HUMPHREYS
inside the Capitol Rotunda. On the audio of the BWC videos, officers can be clearly
heard giving verbal commands to members of the crowd to back up. At 3:08 PM, I
observed HUMPHREYS pushing against officers with his back. At least two separate
officers pushed back on HUMPHREYS with their hands and batons. Over the course of a
minute, HUMPHREYS pushed against the officers twice, both times with his back. One
BWC video showed HUMPHREYS appear to plant his feet in order to push against
officers. The second time HUMPHREYS pushed against the officers, another person's

24

hand was visible on HUMPHREYS' arm, leading to the possibility that another person was pushing HUMPHREYS into the officers during the second push.





e.      I also observed HUMPHREYS on two Capitol security cameras in the foyer between the Rotunda and the Columbus doors on the east side of the Capitol building. HUMPHREYS exited the Rotunda into the foyer at 3:14 PM. HUMPHREYS

made his way from the Rotunda to the Columbus doors and exited the Capitol Building at 3:17 PM.



41.     From my review of the Capitol security camera videos in the Rotunda and the MPD BWCs, I believe that HUMPHREYS intentionally moved from the center of the crowd to the line of police officers who were attempting to push the crowd out of the Rotunda and forcibly attempted to impede and interfere with the officers performing their duties, in violation of 18 U.S.C. 111.

## PRIOR SEARCH WARRANTS OF HUMPHREYS' RESIDENCE AND VEHICLE
### Residence

42.     Through investigation, agents identified 3440 Lebon Drive, Unit 4112, San Diego, CA 92122 as Humphreys' residence. The building located at 3440 Lebon Drive is a tan three-story apartment building located on the southwest corner of Lebon Drive and Nobel Drive in the La Jolla area of San Diego. Underneath the main floor of the building is a one-level parking garage. On the west-facing side of the building is a glass front with a set of glass double doors. The number "3440" is on the glass front in white letters. Unit 4112 is located on the main floor, to the left of the main entrance, with the door facing

west. The numbers "4112" are posted in black lettering on a white sign to the left of the unit door.



43.    HUMPHREYS owns the business HUMPHREYS NATIONAL SECURITY COMPANY LLC, a limited liability company based in both Florida and California. On the website for the company, humphreysnational.com, the address for the company is "3440 Lebon Drive, San Diego, CA 92122-5252. On the "About Us" page of the website, "Jonathan Humphreys" is listed at the director of the company. On the State of California Form LLC-12, which is used for registering limited liability companies in the state, in the "Manager or Member" block, the name listed is "Jonathan A Humphreys" with an address of 3440 Lebon Dr., 4112, San Diego, CA 92122. This name and address are also repeated

in the "Service of Process" block and the "Mailing address of LLC" block on the same form.

44. Legal process served to Verizon for the telephone number 619-496-7355 confirmed that the account was held by HUMPHREYS and that the billing address was 3440 Lebon Drive, Apartment 4112, San Diego, CA 92122. Legal process served to San Diego Gas and Electric (SDG&E) confirmed that HUMPHREYS' service was at that same address.

45. On June 29, 2021, I observed a call box at the main entrance to 3440 Lebon Drive. I scrolled through the unit numbers until I found Unit 4112. The letters "J.H." appeared on the screen next to Unit 4112. On July 6, 2021, I walked through a courtyard on the main floor of 3440 Lebon Drive. I observed a white male closely matching the description of HUMPHREYS outside on the back patio of Unit 4112, wearing headphones and smoking a cigarette. On September 28, 2021, I again scrolled through the same call box and identified unit 4112 as being occupied by "J.H."



**Subject Vehicle**

46.     Agents identified a brown 2005 Ford Ranger bearing California license plate number 7U00662 as HUMPHREYS' vehicle. According to California DMV records, HUMPHREYS is the registered owner of a Ford bearing license plate number 7U00662, as per a query of the California DMV database on July 15, 2021.

47.     On May 30, 2021, at approximately 5:57 PM, U.S. Customs and Border Protection officers stopped HUMPHREYS at the San Ysidro Port of Entry driving a brown Ford Ranger bearing California license plate number 7U00662. HUMPHREYS informed officers that he had taken the vehicle to Mexico to have it repaired. HUMPHREYS provided officers with the home address of 3440 Lebon Drive, San Diego, CA. He also provided his telephone number of 619-496-7355.

48.     On June 30, 2021, I observed a brown Ford Ranger, California license plate number 7U00662 parked in a small parking lot directly to the west of 3440 Lebon Drive. The truck had a small American flag decal on the front left quarter panel and a bed topper over the bed. On September 28, 2021, I observed the same vehicle parked in the same lot, as shown in the photographs below.

**Prior Search**

49.     As noted in paragraph 2, on November 3, 2021, agents executed search warrants at HUMPHREYS' residence and his vehicle. HUMPHREYS was present in his vehicle at the time of the search, and agents seized **subject device 1** from the vehicle's center console. Agents seized **subject device 2** from the bedroom of HUMPHREYS' apartment.

50.     On November 3, 2021, during the execution of the above search warrants of HUMPHREYS' residence and vehicle, I, along with two task force officers, conducted a *Mirandized* interview of HUMPHREYS. HUMPHREYS admitted to being present inside the U.S. Capitol Building on January 6, 2021, and verified that a photograph that the FBI

believed depicted him inside the U.S. Capitol was in fact him. HUMPHREYS further told me that he was present in Washington, D.C. on January 6, 2021 as part of a security contract for his company, Humphreys National Security Company. HUMPHREYS informed me that other security guards were part of this contract, but he declined to name the other guards or who or what he was hired to guard.

## Computers, Electronic/Magnetic Storage, and Forensic Analysis

51.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found in the **subject devices**.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the items described in Attachment B will be stored in the **subject devices** for at least the following reasons:

a.     Individuals who engage in criminal activity, including the above specified offenses, use digital devices, like the **subject devices**, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds

for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation. Based on my knowledge of the planning activities of other subjects who illegally entered the U.S. Capitol Building on January 6, 2021, I know that some of these individuals used end-to-end encrypted messaging applications such as Telegram and Signal to discuss their plans to travel to the U.S. Capitol, and in some cases, used these platforms to discuss conspiracies to disrupt the certification of the election.

b.     Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The

browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

52.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in **subject devices** because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the **subject devices**, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has

been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.     Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.     A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an

accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

**Genuine Risks of Destruction**

f.      The **subject devices** are in the custody of the FBI.  Accordingly, there is no risk of destruction.

**Prior Attempts to Obtain Data**

g.      On January 27, 2022, the Regional Computer Forensics Laboratory completed its extraction of data from the **subject devices**. Shortly thereafter, I subsequently became engaged in other investigations that entailed time-sensitive investigative action. On February 3, 2021, I picked up the **subject devices** and an SD card containing an imaging of both **subject devices** from the RCFL. On February 7, 2021, I began reviewing the contents of the SD card. At the time I reviewed the SD card, I mistakenly thought that I had 120 days to complete the review and seizure of relevant information. Due to technical difficulties on the reviewing computer, I was unable to complete the review. I observed some of what I believe is pertinent

information on the SD card prior to the technical difficulties. Based on the technical difficulties and upcoming unrelated case work, I then sought to obtain an extension to review the **subject devices** and SD card containing the imaging of the phones. While preparing the extension request, I reviewed the warrant and realized that the time frame for review and seizure of relevant data was 90 days rather than 120 days. I have not attempted to access or review the **subject devices** or the SD card since February 7, 2021.

## IV

## PROCEDURES FOR CELLULAR TELEPHONES

53.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device.  Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.  An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.  Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired.  For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to

such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography.  This process is time and labor intensive and may take weeks or longer.

54.     Following the issuance of the search warrants, I will collect the **subject devices** and subject it/them to analysis. All forensic analysis of the data contained within the **subject devices** and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

55.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

# V

## CONCLUSION

56.    Based on the facts and observations set forth above, there is probable cause to believe that HUMPHREYS and others have committed violations of 18 U.S.C. §§ 1752(a)(1) and (2),  40 U.S.C. §§ 5104(e)(2)(D) and (G), 18 U.S.C. § 1512(c), 18 U.S.C. § 111 (a)(1), 18 U.S.C. § 2, and 18 U.S.C. § 231 and that evidence of these crimes, contraband, fruits of the crimes, things otherwise criminally possessed, as well as property designed or intended for use or which is or has been used as a means of committing the crimes, will be located in the **subject devices**

I declare under penalty of perjury that the foregoing is true and correct.

DATE: March 17, 2022

SEAN MACDOUGALL
Special Agent, FBI


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone this 17th day of March, 2022.

Hon. KAREN S. CRAWFORD
United States Magistrate Judge

39

**Attachment A-1**

Samsung Galaxy S10 Serial # RF8M32YZ59B ("**subject device 1**") seized on November 3, 2021 and currently located in evidence at the Federal Bureau of Investigation's San Diego Field Office, 10385 Vista Sorrento Pkwy, San Diego, CA 92121.

**Attachment A-2**

Android cell phone, IMEI 356694097403224 (**subject device 2**) seized on November 3, 2021 and currently located in evidence at the Federal Bureau of Investigation's San Diego Field Office, 10385 Vista Sorrento Pkwy, San Diego, CA 92121.

## Attachment B

## Things to be Seized

Items to be seized are limited to evidence of the offenses under investigation: (1) knowingly entering or remaining in any restricted building or grounds without lawful authority, in violation of **(1) 18 U.S.C. §§ 1752(a)(1) and (2), (2) 40 U.S.C. §§ 5104(e)(2)(D) and (G),  (3) 18 U.S.C. §§ 1512(c), (4) 18 U.S.C. § 111 (a)(1), (5) 18 U.S.C. § 2,** and **(6) 18 U.S.C. § 231** (collectively, the "TARGET OFFENSES") , as well as contraband, fruits of the federal crimes listed above, things otherwise criminally possessed, property designed or intended for use or which is or has been used as a means of committing the crimes listed above.  The items to be searched for and seized includes documents, cellular telephones, computers, and evidence in electronic form.  The time period for the records sought shall be limited to October 1, 2020 through October 26, 2021.

The items to be seized shall be limited to:

a.  Evidence concerning planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

b.  Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

c.  Evidence concerning awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

d.  Evidence concerning efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

e.  Evidence related to a conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

f.  Evidence concerning the breach and unlawful entry of the U.S. Capitol, and any conspiracy or plan to do so, on January 6, 2021;

g.  Evidence of any conspiracy, planning, or preparation to commit those offenses, including travel to or from Washington, D.C.;

h.  Evidence concerning effort after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

i.  Evidence concerning materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or force;

j.  Evidence of the state of mind of HUMPHREYS and/or other co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

k.  Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters related to the criminal activity under investigation, including records that help reveal their whereabouts;